1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES  DISTRICT COURT

Northern District of California

ERNEST JACKSON; DAILY JACKSON

          Plaintiffs,

   v.

CITY AND COUNTY OF SAN
FRANCISCO, *et al.*,

          Defendants.
_____/

No. C 08-02588 MEJ

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

      Pending before the Court is Defendants City and County of San Francisco, Alvin Young, Anna Payne, and Don Garcia's (collectively, "Defendants") Motion for Summary Judgment (Dkt. #20).  Plaintiffs Ernest Jackson and Daily Jackson have filed an Opposition (Dkt. #32), to which Defendants filed a Reply (Dkt. #36).  On August 13, 2009, the Court held oral argument on the Motion.  After considering the parties' briefs, supporting materials, and oral argument, the Court **GRANTS** Defendants' Motion.

## I.  INTRODUCTION

      Plaintiffs initiated this action by filing a Complaint against Defendants in San Francisco Superior Court on April 23, 2008.  (Dkt. #1, Ex. A.)  Defendants removed the action to this Court on May 22, 2008, pursuant to 28 U.S.C. §1441 and §1446.  (Dkt. #1.)  In their Complaint, Plaintiffs allege that on March 29, 2007, while Plaintiff Daily Jackson was filing a petition and paying the filing fee to open probate of his recently-deceased uncle's estate at San Francisco Superior Court, he and Plaintiff Ernest Jackson were unlawfully detained and arrested by San Francisco Sheriff's deputies after the Deputies mistakenly suspected that Plaintiffs were trying to pay the filing fee with counterfeit bills.  Plaintiffs allege that, in detaining them, Defendants discriminated against Plaintiffs because they are African-American.  They assert claims for: (1) violation of their First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights pursuant to 42 U.S.C. §1983; (2) violation of 42 U.S.C.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

§1981; (3) violation of California Civil Code section 51.7; (4) assault and battery; (5) intentional infliction of emotional distress; (6) negligence; (7) negligent selection, training, retention, supervision, investigation, and discipline (against Defendant City and County of San Francisco only); (8) respondeat superior (against Defendant City and County of San Francisco only); (9) violation of California Civil Code section 52.1; (10) false imprisonment; and (11) arrest without warrant.  Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) on each of Plaintiffs' claims.

## II.  LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 247-48.  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Id*.  If the non-moving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  *Celotex*, 477 U.S. at 323.  An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome.  *See Anderson*, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  *Id*. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1   most favorable to that party, could resolve the material issue in his or her favor. *See id.* "If the

2   evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

3   *Id.* at 249-50 (internal citations omitted).

4      A district court may only consider admissible evidence in ruling on a motion for summary

5   judgment. Fed. R. Civ. P. 56(e); *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

6   Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be

7   considered on summary judgment. *Orr*, 285 F.3d at 773-74, 778.

8               **III. DISCUSSION**

9   **A.  Factual Background**

10     Except where indicated, the following facts, taken from the parties Joint Statement of

11  Undisputed Facts (Dkt. #35, "JSOF") and supporting materials, are undisputed.

12     Plaintiff Daily Jackson lives in Dallas, Texas. (JSOF ¶1.) In late March 2007, his uncle,

13  who lived in San Francisco, passed away, prompting Daily Jackson to come to San Francisco.

14  (JSOF ¶1.) Plaintiff Ernest Jackson lives in Daly City and knew Daily Jackson's uncle because they

15  attended the same church. (Dkt. #22, Declaration of Scott Wiener, Ex. D, Deposition of Daily

16  Jackson at 17:5-16.) Daily Jackson had met Ernest Jackson through Daily Jackson's uncle. (D.

17  Jackson Depo. at 17:15-16.) At his uncle's home, Daily Jackson found approximately $12,000 in

18  mostly $100 bills in an envelope under an iron in his uncle's upstairs office. (D. Jackson Depo. at

19  19:20-21:7; 21:11-21.) Daily Jackson's uncle had previously told him to look for money under the

20  iron. (D. Jackson Depo. at 20:11-13.) The bills appeared to be unused and were crisp like new bills.

21  (D. Jackson Depo. at 22:4-22:8; 22:18-23:4; 23:10-14.)

22     While in San Francisco, Daily Jackson was going to probate his uncle's estate. (JSOF ¶1.)

23  Toward that end, on March 29, 2007, Daily Jackson, along with Plaintiff Ernest Jackson, went to

24  San Francisco Superior Court at 400 McAllister Street to open the probate and pay the initial fee.

25  (JSOF ¶1; D. Jackson Depo. at 18:17-24.) Ernest Jackson drove Daily Jackson to the court building.

26  (JSOF ¶¶5, 33.) To pay the filing fee, Daily Jackson brought $600 or $700 dollars from his uncle's

27  money with him. (JSOF ¶3; D. Jackson Depo. at 19:12-19.) Daily Jackson and Ernest Jackson

28

1   entered the Superior Court building together and went to the clerk's office window.  (JSOF ¶5; D.

2   Jackson Depo. at 26:15-25; 28:2-7.)

3        At the clerk's office window, Plaintiffs were assisted by a probate clerk, Hons Yung.  (JSOF

4   ¶6; D. Jackson Depo. at 28:8-18.)  Daily Jackson gave Mr. Yung paperwork Daily had brought with

5   him to file the probate, and Mr. Yung stamped it and told Daily that the filing fee would be $390.[1]

6   (JSOF ¶6; D. Jackson Depo. at 28:8-15, 19-25; Dkt. #22, Ex. A, "Deposition of Hons Yung," at

7   51:6-10.)  Daily Jackson gave Mr. Yung $400 in cash, comprised of four $100 bills that Daily

8   Jackson had found underneath his uncle's iron.  (JSOF ¶7; D. Jackson Depo. at 28:8-15; 29:1-9.)

9   Mr. Yung counted the money and told Daily Jackson that he needed to get change and left the

10  counter.  (JSOF ¶36; D. Jackson Depo. at 31:6-15; Yung Depo. at 53:1-2.)  After counting the

11  money, Mr. Yung suspected that the bills might be counterfeit because they felt like regular paper,

12  and not the way Mr. Yung thought money should feel.  (JSOF ¶8; Yung Depo. at 53:3-15.)  Mr.

13  Yung also examined the bills for watermarks and security strips and found that at least some of the

14  bills were missing them, which also led him to suspect that the bills were counterfeit. (JSOF ¶8;

15  Yung Depo. at 53:20-54:23.)

16        Mr. Yung walked away from the window and took the bills to Tess Cyndecki, the senior

17  fiscal technician, and told her that he needed to get change.[2]  (JSOF ¶9; Yung Depo. at 57:15-22.)

18  At that point, Ms. Cyndecki inspected the bills by feeling them, looking at them under the light, and

19  by applying a counterfeit detection pen to each of the bills.  (Yung Depo. at 58:5-17; 59:19-22; Dkt.

20  #22, Ex. C, "Deposition of Tess Cyndecki," at 21:12-17.)  Ms. Cyndecki thought the texture of the

21  paper felt different than other hundred dollar bills that she had felt.  (JSOF ¶10; Cyndecki Depo. at

22  21:18-22:8.)  When Ms. Cyndecki applied the counterfeit pen, the marking on at least some of the

23  _____

24        [1]Daily Jackson testified that Mr. Yung said the filing fee would be $380.  (D. Jackson Depo.

25  at 28:8-15.)

26        [2]Ms. Cyndecki offers a slightly different account of how she came to inspect the bills that

27  day.  Specifically, she testified that Mr. Yung brought the bills to her and told her that they were for
    a probate filing and asked her to check whether or not they were counterfeit because he thought they

28  looked and felt suspicious.  (Cyndecki Depo. at 20:9-21:2.)

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    bills did not turn black, indicating counterfeit, or remain clear to indicate that the currency was

2    genuine. (JSOF ¶11; Yung Depo. at 59:23-60:10.) By returning a color other than black, the

3    counterfeit pen indicated that the bills were suspect, though not necessarily counterfeit. (JSOF ¶11;

4    Yung Depo. at 11-14.) Because Ms. Cyndecki had doubts about whether the bills were genuine, she

5    called Jennifer Ngo-Chan, who was Mr. Yung's supervisor. (JSOF ¶14; Cyndecki Depo. at 26:3-7,

6    19-25; 27:7-24.) Ms. Ngo-Chan then inspected the bills and noted that although the bills were older,

7    they felt crisp. (JSOF ¶14; Dkt. #22, Ex. B, "Deposition of Jennifer Ngo-Chan," at 20:2-12.) After

8    examining the bills, Defendant Ngo-Chan was not sure whether the bills were genuine or

9    counterfeit. (Ngo-Chan Depo. at 21:2-10.)

10        Ms. Cyndecki called Secret Service, who told her that she should call the police. (Cyndecki

11   Depo. at 59:20-25.) The clerks called the sheriff deputies, who provide security service at the

12   Superior Court building. (JSOF ¶15; Dkt. #24, Declaration of Alvin Young at ¶2.)

13        Defendant Deputy Sheriff Alvin Young was working as a Deputy Sheriff in the San

14   Francisco Superior Court on 400 McAllister Street on March 29, 2007, and was dispatched to the

15   clerk's office to respond to a request for assistance. (JSOF ¶16; Young Decl. at ¶2.) Deputy Young,

16   along with other deputies, arrived in the clerk's office and spoke with the court clerks, who informed

17   Deputy Young of their suspicion about the bills. (JSOF ¶17; Young Decl. at ¶3.) The clerks

18   informed Deputy Young that they had used a counterfeit detection pen on the bills, which had not

19   shown the bills to be either clearly counterfeit or clearly valid. (JSOF ¶17; Young Decl. at ¶3.)

20   Deputy Young then examined the bills. (JSOF ¶17; Young Decl. at ¶3.) He suspected that the bills

21   were counterfeit because they were older bills that were crisp like new bills. (JSOF ¶17; Young

22   Decl. at ¶3.) The clerks identified the persons who were involved in the transaction by indicating

23   that they were at window 25 - the probate window. (JSOF ¶18; Young Decl. at ¶4.)

24        According to Daily Jackson, after several minutes, Mr. Yung returned to the window and

25   told Plaintiffs that he was getting change. (D. Jackson Depo. at 31:16-24.) Daily Jackson was still

26   conversing with Mr. Yung, when a couple of Sheriff Deputies approached them at window 25 and

27   asked Plaintiffs to step aside. (D. Jackson Depo. at 31:25-32:7; Young Decl. at ¶4.) Deputy Young

28

5

1    then asked Plaintiffs to empty their pockets and proceeded to inspect the currency that they took out,

2    which was approximately $300-$400.  (JSOF ¶20; D. Jackson Depo. at 35:21-37-24; Young Decl. at

3    ¶5.)  Deputy Young applied a counterfeit pen to the bills taken out of Plaintiffs' pockets, which

4    showed that some of the bills were suspect.  (JSOF ¶21; Young Decl. at ¶5.)  Deputy Young also

5    noted that the bills were older but felt crisp like new bills.  (JSOF ¶21; Young Decl. at ¶5.)  Based

6    on these observations, Deputy Young suspected that those bills were also counterfeit.  (JSOF ¶21;

7    Young Decl. at ¶5.)

8        Deputy Young then detained Plaintiffs.  (JSOF ¶22; Dkt. #22, Ex. E, "Deposition of Ernest

9    Jackson," at 26:7-18.)  At that point, Defendant Senior Deputy Anna Payne took Plaintiffs to

10   separate holding cells in the Superior Court building, where they remained while the Deputies

11   investigated further.[3]  (JSOF ¶23; D. Jackson Depo. at 39:16-24; 46:20-47:3; 47:10-47:15.)  The

12   Deputies did not handcuff Plaintiffs and no physical force was used on them.  (JSOF ¶24; D.

13   Jackson Depo. at 35:15-20; 44:20-25:2; E. Jackson Depo. at 8:19-25.)  Deputy Payne then called the

14   Sheriff's Department's Investigative Services Unit ("ISU") to report the situation.  (JSOF ¶25;

15   Payne Decl. at ¶2.)

16       On the day of the incident, Defendant Don Garcia was working as a Deputy Sheriff in the

17   San Francisco Sheriff's Department's Investigative Services Unit ("ISU").  (Dkt. #23, Declaration of

18   Deputy Don Garcia at ¶2.)  After ISU received a call from Deputy Payne, Deputy Garcia was

19   dispatched to the Superior Court to investigate.  (JSOF ¶25; Garcia Decl. at ¶2.)  At the time Deputy

20   Garcia arrived at the Superior Court, Daily Jackson and Ernest Jackson were being detained in

21   holding cells.  (JSOF ¶¶26-27; Garcia Decl. at ¶3.)  Deputy Garcia contacted Secret Service to

22   consult the agency about the bills.  (JSOF ¶28; Garcia Decl. at ¶4.)  Based on the information Secret

23   Service provided to him, Deputy Garcia determined that the bills were valid.  (JSOF ¶28; Garcia

24   Decl. at ¶4.)  The Deputies then released Plaintiffs from custody and escorted them back to the

25   _____

26       [3]Defendant Anna Payne was a Senior Deputy Sheriff in the San Francisco Sheriff's
     Department and was working at the Superior Court on March 29, 2007.  (Dkt. #25, Declaration of
27   Anna Payne at ¶2.)  After receiving a call from Deputy Young regarding suspected passing of
     counterfeit money, Deputy Payne want to the clerk's office.  (Payne Decl. at ¶2.)
28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    clerk's office, where they were able to complete their transaction at the probate window and leave.

2    (JSOF ¶29; D. Jackson Depo. 52:7-52:9; 57:7-18; E. Jackson Depo. 34:1-21.)

3    **B.    Plaintiffs' Federal Claims**

4            In their Complaint, Plaintiffs assert federal claims against Defendant City and County of San

5    Francisco and the Deputy Defendants pursuant to Sections 1983 and 1981.[4]  First, Plaintiffs assert a

6    Section 1983 claim against the Deputy Defendants for violation of their Fourth, Ninth, and

7    Fourteenth Amendment rights stemming from their arrests.  Second, Plaintiffs assert a Section 1983

8    claim against the City for instituting an alleged unconstitutional policy, practice, or custom that

9    resulted in Plaintiffs' injuries.  Third, Plaintiffs assert a claim pursuant to Section 1981, charging

10   that their arrest was racially motivated.

11           In their Motion, Defendants contend that they are entitled to summary judgment on each of

12   these claims.  They contend that, because the Deputy Defendants had probable cause to arrest

13   Plaintiffs, there was no constitutional violation, and Plaintiffs' Section 1983 claim therefore fails.

14   Additionally, Defendants contend that the Deputy Defendants are entitled to qualified immunity,

15   thereby shielding them from any lawsuit connected with Plaintiffs' arrests.  As to Plaintiffs' claim

16   for violation of Section 1981, Defendants assert that Plaintiffs lack any evidence of racial animus.

17   Finally, with respect to the Section 1983 claim against the City, Defendants contend that Plaintiffs'

18   claim is untenable because there is no underlying constitutional violation and because Plaintiffs have

19   no evidence to support a *Monell* claim.  The Court will address each argument in turn.[5]

20

21

22           [4]At the hearing, Plaintiffs indicated that they do not oppose the Motion as to Defendant Don

23   Garcia.  Accordingly, the Court will **GRANT** summary judgment in favor of Defendant Garcia.

24           [5]As an initial matter, the Court notes that Plaintiffs failed to submit any evidence in support
     of their Opposition.  At the hearing, Plaintiffs indicated that they did not submit any evidence
25   because Plaintiffs and Defendants are relying on the same evidence, which Defendants have
     submitted with their Motion.  At least with respect to the testimony Plaintiffs relied upon, for the
26   most part those excerpts are not in the record or part of the excerpts that Defendants submitted.  The
     Court has assumed that transcripts excerpts Plaintiffs cited in support of their separate statements of
27   fact support Plaintiffs' factual statements.

28

                                                     7

1.      Plaintiffs' Section 1983 Claim Against the Deputy Defendants

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Defendants first contend that they are entitled to summary judgment on Plaintiffs' §1983 claim because Plaintiffs cannot establish a constitutional violation.  Specifically, Defendants argues that the Deputy Defendants had probable cause to arrest Plaintiffs for suspicion of passing counterfeit currency in violation of 18 U.S.C. § 472.[6]  Plaintiffs, however, maintain that Defendants have failed to establish that probable cause existed.  The Court agrees with Defendants.

"Probable cause to arrest exists when officers have knowledge or reasonable trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "To support a conviction under 18 U.S.C. § 472, the government must prove that 'a counterfeit bill was passed or possessed by the defendant, who knew the bill was counterfeit, and that the defendant passed or possessed the bill with the intent to defraud.'"  *Albillo-Figueroa v. I.N.S.*, 221 F.3d 1070, 1073 (9th Cir. 2000) (quoting *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir. 1979)); *see also Rodis v. City and County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009).

Under § 472, the government must prove that a defendant passed or attempted to pass

---

[6]Plaintiffs were arrested on suspicion of passing counterfeit currency, which is a crime under both federal law and California law.  *See* 18 U.S.C. § 472; Cal. Penal Code §§ 470, 465, 476.  Defendants assert that for purposes of a probable cause analysis, it is sufficient if the Deputies had probable cause under either the federal or state laws.  (Mot. at 5 (citing *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999).)  Defendants' argument is then premised on the Deputies having probable cause to arrest under 18 U.S.C. § 472.  Plaintiffs do not raise any objection to this in their Opposition.  (*See* Opp. at 6.)  Accordingly, the Court will confine its analysis to whether the Deputies had probable cause to arrest Plaintiffs for violation of 18 U.S.C. § 472.

counterfeit currency.  The Ninth Circuit has indicated that probable cause to believe that currency is counterfeit can be demonstrated when the currency looks "odd" and "lack[s] many modern security features."  *Rodis*, 558 F.3d at 971; *accord United States v. Covelli*, 738 F.2d 847, 853-54 (7th Cir. 1984) (holding that probable caused existed to arrest defendant for passing a counterfeit bill when the bill was "new and crisp," "was an unusual color," and did not bear the words, "In God We Trust").

Additionally, to convict under § 472, the government must establish that the defendant had the requisite scienter.  Specifically, it must prove that the defendant had knowledge that the currency was counterfeit and a specific intent to defraud.  *See Rodis*, 558 F.3d at 969-70; *United States v. Palacios*, 385 F.2d 230, 232 (9th Cir. 1987).  The Ninth Circuit had recognized that direct evidence of this knowledge and intent is not necessary; rather, knowledge and intent can be inferred from the circumstances surrounding the transaction.  *See United States v. Lorenzo*, 570 F.2d 294, 299 (9th Cir. 1978); *United States v. Barham*, 466 F.2d 1138, 1141 (9th Cir. 1972) (finding that circumstantial evidence before jury of defendant's knowledge that money was counterfeit was sufficient to support jury finding on that issue and affirming conviction under §472).  The Ninth Circuit has not definitively resolved the issue of the level of evidence necessary to establish probable cause of intent to defraud for purposes of § 472.  *See Rodis*, 558 F.3d at 969-971.  However, it has recognized that "[a]ll of the other circuits to have answered this question . . . have found that '[t]he passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note." *Id*. at 970 (quoting *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983)).

Here, Defendants have set forth sufficient undisputed facts establishing that the Deputy Defendants had probable cause to detain Plaintiffs on suspicion of passing counterfeit currency.  Particularly, Defendants proffer that when the Deputies responded to the call from the court clerks, the clerks informed Deputy Young that they had examined the bills and were suspicious of their authenticity because of the appearance and feel of the bills.  Specifically, the clerks reported that the bills appeared old, but had a crisp feel.  Additionally, the clerks informed the deputies that the bills

9

UNITED STATES DISTRICT COURT
For the Northern District of California

lacked certain security features, including watermarks and security strips and that the counterfeit detection pen showed that the bills were suspect, in that the pen marking indicated that the bills were not clearly authentic and not clearly counterfeit. The clerks also identified the persons who were involved in the transaction by indicating that they were at window 25 - the probate window. It is well-established that officers are permitted to rely on information provided by informants to develop probable cause, provided the officers are in a position to assess the informants' credibility. *See, e.g., Alabama v. White*, 496 U.S. 325, 328-31 (1990); *Illinois v. Gates*, 462 U.S. 213, 213-14 (1983). Because the Deputies spoke directly with the clerks and, as will be discussed next, were able to inspect the bills themselves, thereby corroborating the clerks' information, the Deputies were permitted to consider the information the information the clerks provided.

After speaking with the court clerks, Deputy Young examined the bills. Based on his inspection, Deputy Young suspected that the bills were counterfeit because they were older bills that felt crisp like new bills and because there were multiple $100 bills that appeared and felt the same way.

Thus, as Defendants point out, before taking Plaintiffs into custody, Deputy Young had: (1) spoken with the court clerks about their suspicion concerning the authenticity of the bills; (2) ascertained what the clerks had done to support their suspicions about the bills; and (3) performed his own inspection of the bills. In so doing, Deputy Young had adduced that the two men at the probate window had attempted to pass multiple $100 bills which looked and felt suspicious, and, which the counterfeit detection pen had altered were not verifiably genuine. The look, feel, and counterfeit detection pen results provided probable cause that Plaintiffs passed or were attempting to pass counterfeit currency. The fact that there were multiple bills sharing the same suspicious attributes provided probable cause that the Plaintiffs knew the currency was counterfeit. The passing of the currency coupled with the clerks' identification of the Plaintiffs as the persons who passed the currency provided probable cause of intent to defraud. Taken together, the Court concludes that Defendants have shown that Deputy Young had probable cause to arrest Plaintiffs on suspicion of passing counterfeit currency under 18 U.S.C. § 472.

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In their Opposition, Plaintiffs proffer several arguments in support of their position that

2    Deputy Young lacked probable cause.  First, Plaintiffs argue that, unlike the facts in *Rodis*, where

3    the officers concluded that the bill was "probably counterfeit," here, "[t]here is no evidence the

4    deputies made a conclusion the money passed by Daily Jackson was counterfeit."  (Opp at 7.)

5    Rather, Plaintiffs assert that "[a]ll indications are that the subject money, at best, was 'suspect.'"

6    (*Id*.)  Plaintiffs' argument is unconvincing.  In his Declaration, Deputy Young indicates that, based

7    on his inspection of the bills, he "suspected that the bills were counterfeit."  The Court fails to see

8    any meaningful difference between Deputy Young's statement that he suspected the currency to be

9    counterfeit, and the officers in *Rodis*, who concluded that the bill at issue in that case was "probably

10   counterfeit."  558 F.3d at 967.  In fact, the statement in *Rodis* upon which Plaintiffs rely reads in its

11   entirety: "The officers concluded that the bill was probably counterfeit, but, *because they were*

12   *uncertain*, decided it would be necessary to call the United States Secret Service to get an expert

13   opinion."  *Id*.  Thus, as was the case with Deputy Young, the officers in *Rodis* had strong suspicion

14   that the currency was counterfeit, but were not certain.

15   Again attempting to draw distinctions between the instant case and *Rodis*, Plaintiffs contend

16   that in *Rodis*, it was undisputed that the $100 bill at issue "looked odd."  They argue that, in this

17   case, there is no evidence that the currency "looked odd."  Plaintiffs, however, ignore testimony

18   from Deputy Young that the bills appeared to be older, but looked and felt crisp like new bills.

19   Additionally, Mr. Yung and Ms. Ngo-Chan testified that when they visually examined the bills, they

20   noticed the bills lacked watermarks and security strips.  (Dkt. #22, Ex. A, Yung Depo. 53:20-54:23;

21   Ex. B. Ngo-Chan Depo at 19:19-20:15.)  Thus, there is similar evidence in this case that the

22   currency appeared odd.

23   Third, Plaintiffs contend that Tess Cyndecki testified that she announced that Secret Service

24   had indicated that the bills were not counterfeit in Deputy Payne's presence, which should have

25   precluded the Deputy Defendants from concluding probable cause existed to arrest Plaintiffs.

26   Plaintiffs' argument, however, overlooks the fact Ms. Cyndecki clarified her statement by testifying

27   the Secret Service had told her that the bills' serial numbers were not in the Secret Service's system,

28

11

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   and that she had announced that information in Deputy Payne's presence.  Thus, Ms. Cyndecki's

2   testimony about what she told the Deputies is ambiguous at best.[7]  Moreover, even accepting

3   Plaintiffs' argument that Ms. Cyndecki informed the Deputies that the Secret Service indicated the

4   bills were not counterfeit, this was only one of many facts that the Deputies could have taken into

5   consideration when determining whether they had probable cause to detain Plaintiffs for passing

6   counterfeit bills.

7          Fourth, Plaintiffs argue that the Deputies lacked probable cause to arrest Ernest Jackson.

8   (Opp. at 7-8.)  Specifically, Plaintiffs argue that the only basis the Deputies had for detaining and

9   arresting Ernest Jackson was that he was with Daily Jackson.  Plaintiffs assert that merely "being

10  with" someone does not constitute probable cause for arrest, particularly with respect to a specific

11  intent crime.  In support of their argument, Plaintiffs cite *United States v. Barber*, 557 F.2d 628 (8th

12  Cir. 1977), and *United States v. Di Re*, 332 U.S. 581, 593 (1948).

13         Defendants, however, maintain that from the Deputies' perspective, both Daily Jackson and

14  Ernest Jackson were involved in passing the currency.  Defendants point out that Ernest Jackson was

15  standing in close proximity to Daily Jackson at the probate window.  Deputy Young testified that,

16  when he spoke with the clerks they informed him that the persons involved in the transaction were at

17  window 25.  When Deputy Young went to the probate window, he approached the two men standing

18  in front of it - Plaintiffs.  Based on the totality of these facts, it was reasonable for the Deputies to

19  believe that both Daily Jackson and Ernest Jackson were involved in the transaction involving the

20  suspicious bills.

21         The Court has reviewed the authorities Plaintiffs cited in support and finds them inapposite.

22  In *Barber*, the defendant (Keller) was convicted for aiding and abetting his co-defendant's (Barber)

23  crime of passing a counterfeit note.  557 F.2d at 629.  During the transaction, which occurred when

24  Barber went inside a liquor store and attempted to purchase alcohol with a counterfeit $100 bill,

25  Keller had remained outside the store in the car with two other passengers.  *Id*. at 631-32.  In

26  _____

27         [7]Furthermore, Plaintiffs overlook the fact that the Secret Service agent Ms. Cyndecki spoke
28  with on the phone also advised her to call the police.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    reviewing whether the police had probable cause to arrest Keller in connection with Barber's

2    conduct, the Eighth Circuit noted that, at the time the officers arrested Barber, they only knew that

3    Keller had driven Barber to the liquor store and was waiting outside in the car.  *Id*. at 631.  The court

4    also noted that Barber had not said anything during his arrest that would implicate the occupants in

5    the car as his confederates in crime, and that there was nothing in Barber's observable conduct that

6    would have conveyed any overt indication of criminality such that Keller could be said to have been

7    aware of Barber's criminal nature.  *Id*.  The court therefore concluded that the police had arrested

8    Keller for his "mere association" with Barber and his "mere presence" in the car, and found that the

9    officers lacked probable cause to arrest Keller.  *Id*. at 632.

10           In *Di Re*, the Supreme Court affirmed the Second Circuit's finding that police officers lacked

11   probable cause to arrest the defendant (Di Re) for possession of counterfeit gasoline ration coupons

12   because the information that an informant had conveyed to the officers had not implicated Di Re in

13   any aspect of the illegal transaction.  332 U.S. at 593-94.  The Court noted: "There is no evidence

14   that it is a fact or that the officers had any information indicating that Di Re was in the car when

15   Reed obtained ration coupons from Buttitta, and none that he heard or took part in any conversation

16   on the subject."  *Id*. at 593.  Further, the Court found that the government's argument that

17   accompanying a criminal to a crime rendezvous provides sufficient cause to arrest was "farfetched

18   when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of

19   passerby, in a public street of a large city, and where the alleged substantive crime is one which does

20   not necessarily involve any act visibly criminal."  *Id*.

21           Unlike the defendants in *Barber* and *Di Re*, Ernest Jackson was not merely present with

22   Daily Jackson, but appeared to be participating in the transaction at the probate counter.  Whereas

23   the defendant in *Barber* was waiting outside the store when his co-defendant attempted to pass

24   counterfeit money, it is undisputed that Ernest Jackson entered the courthouse with Daily Jackson,

25   walked with him to the clerk's office and up to the probate window with him, and stood next to or

26   near Daily Jackson during the entire transaction.  Thus, there was not a clear separation between the

27   Plaintiffs in this case as there was in *Barber*, such that it was unreasonable for the Deputies to

28

                                                      13

UNITED STATES DISTRICT COURT
For the Northern District of California

1  conclude that the Plaintiffs were engaged in the transaction together.  Further, unlike *Barber* and *Di*

2  *Re*, the informants in this case, namely the court clerks, informed Deputy Young that the persons

3  who passed the suspect bills were the two men at window 25, thereby suggesting both Daily Jackson

4  and Ernest Jackson were involved in the transaction.[8]  Based on these facts, the Deputies had a

5  sufficient basis - beyond Ernest Jackson's mere presence - to reasonably conclude that he was part

6  of the transaction involving the suspect bills.

7       Having determined that the Deputies had probable cause to arrest Plaintiffs, the next issue

8  that Court must address is whether the subsequent search of Plaintiffs was lawful.  Defendants argue

9  that once the Deputy Defendants had probable cause to arrest Plaintiffs, they were legally permitted

10  to search Plaintiffs, including having Plaintiffs empty their pockets.  (Mot. at 7.)  It is well-settled

11  that, "[a] 'search incident to arrest' is an exception to the general rule against warrantless searches."

12  *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996).  The exception "permits law

13  enforcement officers to conduct a warrantless search of a person who is arrested, and of his

14  surrounding area, when the search is incident to arrest."  *United States v. Smith*, 389 F.3d 944,

15  950-51 (9th Cir. 2004).  "A legitimate 'search incident to arrest' is limited to the arrestee's person

16  and to the area 'within his immediate control,' meaning 'the area from within which he might gain

17  possession of a weapon or destructible evidence.'"  *Hudson*, 100 F.3d at 1419.  Plaintiffs have not

18  presented any argument on this issue in their Opposition.  Reviewing the evidence, it is undisputed

19  that the Deputies searched Plaintiffs following their determination that probable cause existed to

20  arrest them.  Thus, the search of Plaintiffs' persons were reasonable under the Fourth Amendment.

21       In sum, the Court finds that based on the information provided by the court clerks and their

[8]Moreover, Ernest Jackson testified that he communicated with the court clerk staff. Specifically, Ernest Jackson testified that while he and Daily Jackson were waiting for the clerk to bring the change, he asked the clerk, "What is the problem?"  Thus, unlike the defendants in *Barber* and *Di Re,* Ernest Jackson demonstrated some connection with the transaction when he questioned the clerk about the delay in providing change.  While Plaintiffs contend that Ernest Jackson did not have any interaction or communication with the clerk staff until after Daily Jackson provided the allegedly suspect currency, this does not diminish the fact that he did evince some involvement in the transaction by questioning the clerk staff.

14

1    own investigation of the bills, the Deputy Defendants had probable cause to arrest Plaintiffs.

2    Further, the Deputies' search incident to Plaintiffs' arrest was lawful.  Accordingly, because

3    Defendants have shown that the Deputy Defendants had probable cause to arrest Plaintiffs and to

4    conduct a search incident to arrest, Plaintiffs' § 1983 against the Deputies fails.  The Deputy

5    Defendants are therefore entitled to summary judgment on this claim.

6              2.    <u>Qualified Immunity</u>

7              Defendants next contend that Plaintiffs' claims against the Deputies must be dismissed

8    because the Deputies are protected by qualified immunity.  (Mot. at 8.)  They argue that, "[w]hatever

9    the Court's ruling on the underlying Fourth Amendment issue, it was not clearly established at the

10   time of the arrest that the [D]eputies lacked probable cause to arrest Plaintiffs based on the

11   information in the [D]eputies' possession."  (Mot. at 8.)  Plaintiffs, however, argue that, at the time of

12   the arrest, the state of the law was such that the Deputies were on notice of the illegality of their

13   actions.  (Opp. at 7.)  Plaintiffs thus maintain that the Deputies are not entitled to qualified

14   immunity.  (Opp. at 7.)  After carefully considering the parties' arguments and case law, the Court

15   agrees with Defendants.

16             "Qualified immunity shields public officials from civil damages for performance of

17   discretionary functions."  *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009).  As the Supreme

18   Court explained, the doctrine provides "an *immunity from suit* rather than a mere defense to

19   liability[.]"  *Mitchell v. Forsyth*, 472 U.S.511, 526 (1985).  "Under qualified immunity, an officer

20   will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient,

21   reasonably misapprehends the law governing the circumstances.'"  *Mueller*, 576 F.3d at 993

22   (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also Saucier v. Katz*, 533 U.S. 194,

23   206 (2001).  Thus, "[q]ualified immunity protects 'all but the plainly incompetent or those who

24   knowingly violate the law.'"  *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "The

25   standard is an objective one that leaves 'ample room for mistaken judgments.'"  *Id*. (quoting *Malley*,

26   475 U.S. at 343).

27             When a court is presented with a qualified immunity defense, it must undertake a two-

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    pronged inquiry. *See Saucier*, 533 U.S. at 201. First, the Court must determine whether the facts

2    alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct

3    violated a statutory or constitutional right. *Id*. If the Court determines that there was no violation,

4    the inquiry ends. *Id*. Second, if a constitutional violation is established, the Court must determine

5    whether the right at issue was "clearly established" at the time of the event in question and "in light

6    of the specific context of the case, not as a broad general proposition." *Id.*

7            Until recently, courts were required to address the two questions set forth above in order.

8    However, the United States Supreme Court has recently abandoned *Saucier*'s two-step protocol,

9    holding that "while the sequence set forth there is often appropriate, it should no longer be regarded

10   as mandatory." *Pearson v. Callahan*, --- U.S. ----, ----, 129 S. Ct. 808, 818, 172 L. Ed.2d 565

11   (2009). Instead, the Supreme Court instructed that, "judges of the district courts and the courts of

12   appeals should be permitted to exercise their sound discretion in deciding which of the two prongs

13   of the qualified immunity analysis should be addressed first in light of the circumstances in the

14   particular case at hand." *Id*. Thus, if under the first prong, the Court determines that plaintiff's

15   allegations do not make out a statutory or constitutional violation, "there is no necessity for further

16   inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. If, however, the Court begins

17   its inquiry with the second question and determines that the right at issue was not clearly established

18   at the time of the defendant's alleged misconduct, the Court may end further inquiries concerning

19   qualified immunity at that point without determining whether the allegations in fact make out a

20   statutory or constitutional violation. *See Pearson*, 129 S. Ct. at 818-21.

21           As set forth above, the Court has determined that Plaintiffs have failed to establish a

22   violation of their constitutional rights. This conclusion is sufficient to end the Court's inquiry. *See*

23   *Saucier*, 533 U.S. at 201. However, in the interest of thoroughness, the Court will address the

24   second prong of the qualified immunity analysis.

25           "Under the second step, to attach liability '[t]he contours of the right must be sufficiently

26   clear that a reasonable official would understand what he is doing violates that right.'" *Mueller*, 576

27   F.3d at 993 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This framework means

28

                                                      16

UNITED STATES DISTRICT COURT
For the Northern District of California

1    that 'the right allegedly violated must be defined at the appropriate level of specificity before a court

2    can determine if it was clearly established.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615

3    (1999)).  "The dispositive inquiry is 'whether it would be clear to a reasonable [official] that his

4    conduct was unlawful in the situation he confronted.'"  *CarePartners, LLC v. Lashway*, 545 F.3d

5    867, 882 (9th Cir. 2008) (quoting *Suacier*, 533 U.S. at 202).

6         Here, Defendants contend that, at the time of the events of this case, it was not clearly

7    established that the Deputies lacked probable cause to arrest Plaintiffs based on the information in

8    the Deputies' possession.  In particular, Defendants contend that the Ninth Circuit's decision in

9    *Rodis* controls this inquiry.  In that case, the plaintiff was arrested on suspicion of violating 18

10   U.S.C. § 472 after he passed a 1985 series $100 bill to a store cashier who suspected that it was

11   counterfeit.  *Rodis*, 558 F.3d at 967.  The cashier showed the bill to the store manager, who

12   examined the bill and also believed it to be counterfeit.[9]  *Id.*  Although the counterfeit detection pen

13   that the manager applied indicated that the bill was authentic, the manager remained suspicious

14   because of the bill's appearance and texture, and proceeded to call the police.  *Id.*  When the four

15   officers arrived at the scene, the manager conveyed his suspicions about the bill.  *Id.*  The officers

16   then examined the bill and concluded that it was "probably counterfeit."  *Id.*  However, because they

17   were uncertain, the officers decided it was necessary to call the Secret Service to get an expert

18   opinion.  *Id.*  Before getting a response from the Secret Service, the officers arrested the plaintiff on

19   suspicion of violation 18 U.S.C. § 472.  *Id.*  It was undisputed that the officers did not make any

20   effort to investigate the plaintiff's state of mind before effecting the arrest.  *Id.*  After the officers

21   transported the plaintiff to the police station, they spoke with the Secret Service agent about the

22   details of the bill, who confirmed that the bill was genuine.  *Id.*  The officers then released the

23   plaintiff from custody.

24        As in this case, the plaintiff then brought a § 1983 action against the City and County of San

25   Francisco, the San Francisco Police Department, and the officers involved in the arrest.  The

26   _____

27        [9]In *Rodis*, the manager applied a counterfeit detection pen to the $100 bill, which indicated
     that it was authentic.  *See Rodis*, 558 F.3d at 967.
28

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1    defendants moved for summary judgment, including on the basis of qualified immunity fort he

2    officers.  *Id*.  The district court rejected the officers' qualified immunity argument, finding that

3    because the officers lacked evidence of the plaintiff's intent to defraud, they lacked probable cause

4    and the resulting arrest was unlawful.  *Id*.  The district court further found that the illegality of the

5    arrest was clearly established at the time, and thus qualified immunity did not apply.  *Id*.  The

6    defendants filed an interlocutory appeal to the Ninth Circuit and the Ninth Circuit affirmed the

7    district court's decision.  *Id*. at 967-68.  The Supreme Court thereafter granted the defendants'

8    petition for a writ of certiorari, vacated the Ninth Circuit's decision, and remanded the matter back

9    for further consideration in light of *Pearson*.  *Id*. at 968.

10         Revisiting the qualified immunity argument on remand, the Ninth Circuit reversed the

11   district court's decision.  Turning its attention to the question whether the right asserted was clearly

12   established, the Ninth Circuit found that, based on the facts before it, the right was not clearly

13   established.  In reaching its decision, the Ninth Circuit first noted that possession of counterfeit

14   currency is a specific intent crime.  *Id*. at 969-70.  Thus, it found that "it was clearly established that

15   the defendants were required to have probable cause of the plaintiff's specific intent to defraud the

16   store for a lawful arrest."  *Id*. at 970.  However, when assessing what the contours of that right were,

17   the Ninth Circuit acknowledged that it had yet to address that issue.  Specifically, the defendants

18   argued that they had probable cause as to the plaintiff's intent based solely on evidence suggesting

19   that the bill might have been fake.  *Id*.  The plaintiff, on the other hand, argued that the officers were

20   required to have specific evidence of his intent to defraud, beyond the fact that he had tendered a

21   potentially unlawful counterfeit bill.  *Id*.  Faced with these two competing standards, the Ninth

22   Circuit acknowledged that while this was an issue of first impression in this circuit, "[a]ll of the

23   other circuits that have addressed this question, however, have found that '[t]he passing of a

24   counterfeit note coupled with an identification of the person who passed  the note furnishes probable

25   cause to arrest the individual identified as passing the note."  *Id*. (quoting *United States v. Everett*,

26   719 F.2d 1119, 1120 (11th Cir. 1983)).  The court noted that, under *Pearson*, irrespective of which

27   standard it adopted, the defendants would be entitled to qualified immunity.  As the Ninth Circuit

28

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1    explained:

2            [R]egardless of whether we determine that evidence beyond the tender
             of a counterfeit bill was required, Defendants are entitled to qualified
3            immunity.  Were we to decide that there was a violation, we would
             create a circuit split and Defendants would not have been on notice
4            that their conduct was unlawful.  Were we to decide that this evidence
             was not required, Rodis's claim would fail in the first instance.
5            Because it is unnecessary to disposition of this case, we decline to
             decide this question.

6

7    *Id.*  The court therefore assumed that the tender of a counterfeit bill was enough to establish

8    probable cause and turned to the question of whether the officers' belief that the bill was fake was

9    reasonable.  *Id.*

10          With respect to this question, the Ninth Circuit emphasized that the doctrine of qualified

11   immunity protects law enforcement officials who reasonably but mistakenly concluded that probable

12   cause is present.  *Id.* at 970-71.  Analyzing the facts before it, the court noted that it was undisputed

13   that the plaintiff's $100 bill "looked odd," and "lacked many modern security features."  *Id.* at 971.

14   Based on those facts, the Ninth Circuit held that the officers' belief that the bill was fake was not

15   plainly incompetent.  *Id.*  The court therefore held that the arrest was not clearly established as

16   unlawful, entitling the defendants to qualified immunity.  *Id.*

17          Relying on the Ninth Circuit's decision in *Rodis*, Defendants contend that the Deputies in

18   this case are also entitled to qualified immunity because none of the bases supporting their

19   determination of probable cause to arrest on suspicion of violating § 472 have been clearly

20   established as unlawful.  (Mot. at 9.)  They argue that prior court decisions have validated arrests for

21   passing counterfeit currency based on observations that the bills at issue were odd-looking, lacking

22   in modern security features, and grouped with other similarly-odd bills.  (Mot. at 8-9.)  With respect

23   to the element of intent, Defendants argue that the facts of the instant case are even stronger than

24   those in *Rodis*, in that, Plaintiffs passed multiple suspect $100 bills, not just a single suspicious bill.

25   (Mot. at 6.)  Thus, Defendants argue that there are no cases putting the Deputies on notice that an

26   arrest based on the facts before them would be illegal.  (Mot. at 8-9.)  In light of the facts and

27   analysis set forth by the Ninth Circuit in *Rodis*, the Court agrees with Defendants.

28

                                                  19

1      Plaintiffs, however, argue that at the time of their arrest, the state of the law was such that the

2   Deputies were on notice of the illegality of their actions.  (Opp. at 7.)  Specifically, Plaintiffs assert

3   that, at the time of their arrest, the district court's decision in *Rodis* had been issued, which denied

4   the officers' qualified immunity argument.  Plaintiffs' argument is unavailing.  First, this Court fails

5   to see how the district court's decision in *Rodis* could be said to have clearly established the

6   probable cause standards required to arrest for suspicion of passing counterfeit currency, especially

7   in light of the weight of authority from other circuits with respect to the element of intent.  Rather,

8   as was the case in *Rodis*, the district court's decision would have created a split in authority, thereby

9   entitling the Deputies to qualified immunity.  Furthermore, at the time of Plaintiffs' arrest, the

10  district court decision in *Rodis* was on appeal to the Ninth Circuit.  Thus, whatever the district

11  court's finding as to the legality of the officers' arrest in *Rodis*, it was hardly settled law based on

12  the pending appeal.  The Court therefore rejects Plaintiffs' argument.

13     In sum, the Court finds that: (1) Plaintiffs have not shown that the Deputies violated a

14  constitutional right; and (2) Plaintiffs have not shown that their rights were clearly established such

15  that the Deputies would have understood that what they were doing violated the law.  The Deputies

16  are therefore entitled to qualified immunity against Plaintiffs' federal claims.

17        3.    Excessive Force

18     In their Complaint, Plaintiffs allege that the Deputies used excessive force during their arrest.

19  Defendants now move for summary judgment on this claim.

20     In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the United States Supreme Court held that

21  claims alleging that law enforcement officials used excessive force during an arrest, investigatory

22  stop, or other seizure should be analyzed under the Fourth Amendment's "objective reasonableness"

23  standard.  *Graham*, 490 U.S. at 395; *see also Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir.

24  2002); *Robinson v. Solano County*, 278 F.3d 1007, 1009 (9th Cir. 2002).  Under the Fourth

25  Amendment, officers may only use such force as is "objectively reasonable" under the

26  circumstances.  *Graham*, 490 U.S. at 397.  To determine whether the force used was reasonable,

27  courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   interests against the countervailing governmental interests at stake." *Id.* at 396 (citations omitted);

2   *Billington*, 292 F.3d at 1184.

3       Defendants contend that they are entitled to summary judgment on this claim because it is

4   undisputed that the Deputies did not use *any* force on Plaintiffs and, in fact, did not even use

5   handcuffs during the arrest.  (Mot. at 10.)  In their Opposition, Plaintiffs failed to proffer any

6   argument or evidence responding to Defendants' argument or supporting their claim.  Thus,

7   Plaintiffs have effectively conceded to summary judgment in favor of Defendants on the excessive

8   force claim.[10]  The Court will therefore **GRANT** summary judgment in favor of Defendants' on

9   Plaintiffs' excessive force claim.

10          4.    42 U.S.C. § 1981 Claim for Race Discrimination

11      Defendants move for summary judgment on Plaintiff's § 1981 claim.  Section 1981 provides:

12   "[a]ll persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give

13   evidence, and to the full and equal benefit of all laws and proceedings."[11]  Thus, § 1981 prohibits

14   racial discrimination through state or private action, and requires a showing of intentional

15   discrimination on account of race.  *See Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989).

16      In their Motion, Defendants contend that "Plaintiffs' only 'evidence' of race discrimination

17

18       [10]At the hearing on Defendants' Motion, the Court questioned Plaintiffs about what evidence
19   they had in support of their claim.  Plaintiffs responded that, in effectuating the arrest, the Deputies
     put their hands on Plaintiffs when putting them into elevator, told them to face the back, and spun
20   Plaintiffs around.  Plaintiffs further explained, that in light of their position that the Deputies lacked
21   probable cause, any force used against Plaintiffs was excessive.  Even considering this evidence -
     which appears nowhere in the record - the Court fails to see how touching Plaintiffs, instructing
22   them to face the back of the elevator, and spinning them around raises a genuine issue of fact as to
23   the objective reasonableness of the Deputies use of force.

24       [11]Generally, a contractual relationship is a prerequisite to a § 1981 claim.  *See Graham v.*
25   *Jones*, 709 F. Supp. 969, 972-73 (D. Or. 1989) (citing *Runyon v. McCrary*, 427 U.S. 160, 168
     (1976)); *see also Brew v. City of Emeryville*, 138 F. Supp. 2d 1217, 1224 (N.D. Cal. 2001) (granting
26   summary judgment in favor of city and police officers on § 1981 claim premised on false arrest).
27   Because Plaintiffs have not presented any evidence that Defendants interfered with their right "to
     make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all
28   laws and proceedings," the legal underpinning for their § 1981 claim is unclear.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    is that Deputy Young approached them and that they were the only African-American people in the

2    public area of the clerk's office." (Mot. at 10.)  Defendants assert that, "the undisputed evidence

3    shows that Deputy Young approached Plaintiffs because they were at window 25 (the probate

4    window), which is exactly where the clerks told him the suspects were."  (*Id.*)

5            Plaintiffs maintain that the only suspicion that the Deputies had when arresting Plaintiffs

6    "was based on the fact that Daily Jackson was a black man with a large amount of cash." (Opp. at

7    11.)  Plaintiffs also contend that "Tess Cyndecki's statement and deposition testimony indicate that

8    she was told by Hons Yung that it was "African American [m]ales" who provided the bill." (Opp. at

9    11.)  According to Plaintiffs, "[t]his information was passed onto the [D]eputies and, instead of

10   diffusing the motive with their own investigation, they escalated it." (Opp. at 11.)

11           The Court has carefully considered the parties' arguments and the record evidence, and finds

12   that Plaintiffs have failed to proffer sufficient evidence in support of their claim.  As Defendants

13   point out, Deputy Young stated that the clerks informed him that the persons who had passed the

14   suspect bills were the two men at window 25.  Deputy Young stated that he then approached the two

15   men who were directly in front of window 25 and asked them to step aside.  Plaintiffs have not

16   proffered any evidence contradicting Deputy Young's statement or otherwise indicating that it was

17   Plaintiffs' race, rather than the clerk's statement that the suspects were at the probate window, that

18   motivated the Deputies to arrest Plaintiffs.  In particular, Plaintiffs' argument that because Hons

19   Yung told Tess Cyndecki that the persons at the counter were African-American does not go to the

20   Deputies' motivation for effecting Plaintiffs' arrest.  As Defendants point out, the fact that Mr. Yung

21   (who was a clerk employee, and not an employee of the Defendant City) referred to Plaintiffs' race

22   when describing them to Ms. Cyndecki (another clerk employee) does not support Plaintiffs' charge

23   that the Deputies then arrested Plaintiffs based on their race.  Because Plaintiffs have failed to

24   present evidence creating a triable issue of fact on their § 1981 claim, the Court will **GRANT**

25   summary judgment in favor of the Defendants.

26   / / /

27   / / /

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

5.    <u>Section 1983 Claim Against the City and County of San Francisco</u>

Defendant City and County of San Francisco moves for summary judgment on Plaintiffs' § 1983 claim against it.  Under § 1983, local government entities are considered "persons" and therefore may be sued, but the municipality's liability must be premised on its own infliction of an injury and not on a respondeat superior theory.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  To establish municipal liability, a plaintiff must show that: (1) a municipal employee violated his constitutional rights; (2) the municipality had a custom, practice, or policy that amounted to "deliberate indifference"; and (3) the municipal custom, practice, or policy was the "moving force" behind the employee's violation of the plaintiff's constitutional rights.  *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002).

The City argues that Plaintiffs' claim fails because they cannot show any violation of their constitutional rights and because they cannot establish that any action by the City caused the purported violation.  Plaintiffs, however, maintain that they have established sufficient facts to support their § 1983 claim against the City.  (Opp. at 10-11.)  The Court agrees with the City.

As the City points out, based on the determination set forth above that Plaintiffs arrest was based on probable cause, Plaintiffs cannot show a constitutional violation as is required to support their § 1983 against the City.  For this reason, their § 1983 claim fails.  *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

Even assuming that Plaintiffs could establish a constitutional violation, the City contends that Plaintiffs have not set forth any evidence of a City policy, practice, or custom that was the moving force behind the violation.  (Mot. at 12-14.)  On this point, Plaintiffs contend that based the facts in *Rodis*, "there is evidence that peace officers employed by Defendant City and County of San Francisco have a practice of arresting non-white people for passing counterfeit money even when counterfeit pens are applied and don't show the money to be counterfeit and there is no evidence of specific intent besides the passing of the bill itself."  (Opp. at 10.)  According to Plaintiffs, "[t]hat the City condoned the actions of its officers in *Rodis* (by representing the officers and successfully appealing the District Court) and here further justifies imposition of liability."  (Opp. at 10-11.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Plaintiffs' argument, however, falls short in several respects. First, as the City correctly

2   points out, *Rodis* concerned an arrest made by San Francisco Police officers - not Sheriff Deputies,

3   as is the case here. Plaintiffs have not put forward any explanation as to how the actions of different

4   agencies are related such that a common policy, practice, or custom existed. Second, Plaintiffs'

5   reliance on *Rodis* as support for its claim that an unconstitutional pattern or practice exists is also

6   misplaced. The Ninth Circuit confined its qualified immunity analysis to the issue of whether the

7   right asserted in that case was clearly established; it did not examine whether a constitutional

8   violation occurred. Thus, *Rodis* does not advance Plaintiffs' allegation that a pattern of

9   unconstitutional activity exists. Third, Plaintiffs cite no legal authority in support of their argument

10  that, by representing the police officers in *Rodis* and successfully appealing the district court's

11  decision, the City condoned or ratified the police officers' conduct in that action. Thus, Plaintiffs'

12  reliance on *Rodis* is insufficient to establish that a policy, practice, or custom by the City that led to

13  a violation of Plaintiffs' constitutional rights.

14   Because Plaintiffs have failed to present evidence of a policy, practice, or custom by the

15  City, and because the Court has found that Plaintiffs' constitutional rights were not violated,

16  Plaintiffs cannot proceed with their § 1983 claim against the City. The Court will therefore

17  **GRANT** summary judgment in favor of the city on this Claim.

18   6.   56(f) Request

19   In the event the Court is inclined to grant Defendants' motion, Plaintiffs request that the

20  Court first grant them the opportunity to conduct additional discovery pursuant to Federal Rule of

21  Civil Procedure 56(f). (Opp. at 12.) Specifically, Plaintiffs request that the Court permit them to

22  depose the witnesses whose declarations Defendants submitted in support of their Motion and to

23  depose Defendants pursuant to Rule 30(b)(6). Notably, Plaintiffs failed to proffer any convincing

24  explanation as to why they neglected to gather the facts and materials they now seek before

25  discovery closed in this matter. While Plaintiffs contend that they did not believe that there would

26  be any factual disputes with respect to the Defendants' account of Plaintiffs' arrest, it was Plaintiffs'

27  responsibility to investigate that during the discovery period, not after Defendants moved for

28

24

1   summary judgment.  The Court will therefore **DENY** Plaintiffs' request.

2   **C.      Plaintiffs' California Claims**

3           As indicated above, in their Complaint, Plaintiffs asserted claims under California law for:

4   (1) false imprisonment and false arrest; (2) assault and battery ; (3) negligence; (4) intentional

5   infliction of emotional distress; (5) negligent selection, training, retention, supervision,

6   investigation, and discipline; (6) violation of California Civil Code section 51.7; (7) violation of

7   California Civil Code section 52.1; and (8) respondeat superior.  Defendants move for summary

8   judgment on each of these claims on various legal and evidentiary grounds.  Aside from arguing that

9   Defendants lacked probable cause to arrest them and that the arrest was racially-motivated, Plaintiffs

10  have failed to present any argument in defense of their state law claims.  The Court has thoroughly

11  considered the Defendants' arguments and has reviewed the evidence they cited in support.  Because

12  the Court finds Defendants' arguments to be well-taken, and because Plaintiffs have effectively

13  conceded their state law claims by failing to respond to Defendants' arguments, the Court will

14  **GRANT** summary judgment in favor of Defendants on these claims.  *See Keenan v. Allan*, 91 F.3d

15  1275, 1279 (9th Cir. 1996) (noting that it is not the court's task to scour the record in search of a

16  genuine issue of triable fact; the court relies on the non-moving party to identify with reasonable

17  particularity the evidence that precludes summary judgment).

18                                    **IV.  CONCLUSION**

19          For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary

20  Judgement (Dkt. #20) in its entirety.  Further, the Court **DENIES** Plaintiffs' Rule 56(f) request.

21          **IT IS SO ORDERED.**

22

23  Dated: September 22, 2009

24                                                    _____
                                                      Maria-Elena James
25                                                    Chief United States Magistrate Judge

26

27

28

                                          25

*UNITED STATES DISTRICT COURT*
*For the Northern District of California*